**IN THE UNITED STATE DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION**

Allstate Financial Services, LLC,

                            Plaintiff,

        v.                                                  Case No. 3:23-cv-00014

J. Brett Butler,

                            Defendant.

## <u>MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER</u>

## I.      INTRODUCTION AND NATURE OF THE CASE

AFS brings this motion for a temporary restraining order to stop Butler, a former AFS Registered Representative ("RR"), from exploiting AFS's confidential and proprietary information ("Confidential Information"), from interfering with AFS's long-standing customer relationships, and from breaching the post-termination obligations and duties Butler owes AFS.  As is more fully explained below, Butler is in violation of the agreement he signed with AFS and the law by illegally competing with AFS from his former AFS location, soliciting AFS customers, retaining AFS Confidential Information and using AFS Confidential Information to compete with AFS.

Before leaving AFS, Butler and his new employer, Prudential, instructed Butler's former employee to access Allstate's confidential and proprietary databases ("databases"), copy the Allstate Confidential Information contained in the databases (such as confidential contact information), and place the copied Confidential Information onto a flash drive to create a "Holiday List" for Butler's use at Prudential.  After the former employee rejected Butler's request, Butler

20720714 v2

sought—and received—assistance from his nineteen year old son and two interns, who accessed, copied and printed AFS Confidential Information for Butler's use after leaving AFS. Since leaving AFS, Butler has retained and continues to use AFS's Confidential Information to solicit AFS customers in violation of his contractual and legal obligations.

On January 6, 2023, AFS sent Butler a letter, wherein AFS reminded Butler of his contractual and legal obligations to AFS, requested that he stop breaching those obligations, and warned him that AFS would initiate a legal action to enforce and protect its rights and Confidential Information. Butler responded via letter dated January 11, 2023, wherein Butler claimed that he is "in compliance" with the duties and obligations he owes AFS, but simultaneously admitted that his current office location remains at the same address as his former AFS Location, in violation of his agreement with AFS. Butler's response also ignored AFS's requests to return the Confidential Information.

Butler's continued breaches of his contractual and legal obligations to AFS, including the retention of AFS Confidential Information, shows his indifference for the ongoing obligations he owes AFS. Butler's actions have already caused, and will continue to cause, irreparable harm to AFS through the loss of its customer relationships, goodwill, and misappropriation of its Confidential Information. A temporary restraining order is necessary to prevent this irreparable harm.

## II.   STATEMENT OF FACTS

### A.   AFS's Business and Hiring of RRs

AFS is one of the nation's leading providers of financial products and services to individuals and businesses. (Verified Complaint ("Compl."), ¶ 17.) AFS provides securities, mutual funds, and annuities, among other products. (*Id.*) In addition to providing these products directly, AFS appoints Registered Representatives ("RRs") to sell AFS products. (*Id.* ¶ 18.) To

ensure AFS is providing the highest level of service, AFS rigorously screens its RRs to ensure that the RRs are qualified to represent and sell AFS products, have the proper tools and facilities to analyze and meet customer needs, and can furnish customers with appropriate financial solutions. (*Id.* ¶ 19.)  AFS also expends substantial resources advertising, marketing, and promoting its products.  (*Id.* ¶ 20.)  The RRs benefit directly and indirectly from AFS's advertising, marketing, and promotional efforts, as well as from AFS's goodwill, reputation, and name recognition.  (*Id.* ¶ 21.)  These efforts and expenditures allow the RRs to develop and cultivate customer accounts and relationships on behalf of AFS.  (*Id.*)

AFS is affiliated with Allstate Insurance Company ("AIC").  (*Id.* ¶ 23.)  AIC is one of the nation's leading providers of insurance products to individuals and businesses.  (*Id.* ¶ 22.)  Among other things, AIC provides automobile, property, and casualty insurance to individuals and businesses.  (*Id.*)  In addition to providing these products directly, AIC appoints independent exclusive agents ("Exclusive Agents"), through its Exclusive Agency Program, to sell AIC products.  (*Id.*)

To assist RRs in selling AFS products, a RR is paired with one or more Exclusive Agents who sell AIC products.  (*Id.* ¶ 23.)  By pairing the RR with multiple Exclusive Agents, the RR is able to sell registered products to AIC automotive, property and casualty insurance customers.  (*Id.* ¶ 24.)  In other words, through AIC and the Exclusive Agents, a RR is introduced to AIC customers for the purpose of selling AFS registered products to AIC customers. (*Id.* ¶ 25.)  A RR would not have access to the AIC customer but for being affiliated with Plaintiff AFS and having AIC and/or the Exclusive Agent introduce the customer to the RR.  (*Id.*)

AFS relies heavily upon repeat business to maintain its competitive advantage in the highly competitive financial services industry.  (*Id.* ¶ 26.)  Maintaining goodwill and a solid business

reputation with its customers is a critical component of AFS's success.  (*Id.*)  Because AFS's business is a service business, the relationship that each RR has with AFS customers is highly dependent on the attention and excellent service given to the customers on an ongoing basis and the continued trust the customers place in AFS as a leading provider of such services. (*Id.*)

B.     **AFS's Protection of Its Confidential Information**

AFS customers entrust AFS and its RRs to safeguard and protect their private information, which includes information relating to, among other things, their personal data, date of birth, social security numbers, types of products, amount of insurance and products, premium amounts, renewal dates, description and location of assets and property, claims histories, financial needs, pricing information, and other financial and personal information, from unauthorized use or disclosure. (Compl. ¶ 27.)  This unique compilation data is part and parcel of what allows AFS to be competitive in the financial services market.  (*Id*.)

AFS protects this information by, among other things: limiting the disclosure and use of this information to only the RR who needs this information to sell AFS products (even the RR's employees are expressly denied access to such information unless they also sign a Confidentiality and Non-Competition Agreement with AFS); educating the RR about the requirements and necessity of keeping this information confidential; restricting access to this information by limiting access to computer networks and requiring the use of passwords to access the information; and requiring the RRs to execute written agreements that protect against the misuse and improper disclosure of AFS Confidential Information.  (*Id.* ¶ 28.)  Consequently, all RRs, pursuant to their agreements with AFS and while performing services under their agreements, acknowledge that they will have access to AFS Confidential Information, promise to not disclose AFS Confidential Information to anyone not authorized to receive it, and confirm that they will not use AFS Confidential Information for their own benefit or for any improper purpose.  (*Id.* ¶ 29.)

4

RRs agree, upon termination of their relationship with AFS, to continue treating AFS Confidential Information as confidential, to not disclose, either directly or indirectly, AFS Confidential Information to any third party, and to immediately return all AFS Confidential Information to AFS.  (*Id.* ¶ 30.)  These measures ensure that AFS's Confidential Information is not publicly available, thereby protecting AFS customers' privacy and providing AFS with a competitive advantage in the highly competitive financial products business.  (*Id.* ¶ 31.)

### C.     Butler Enters Into the Agreement To Solicit and Sell Registered AFS Products

After proceeding through AFS's rigorous screening process, Butler executed the "Allstate Financial Services, LLC Registered Representative Agreement (for Allstate Exclusive Financial Specialist Independent Contractors)" (the "Agreement") and became a RR on April 18, 2005. (Compl. ¶ 32; *see* Agreement, attached to the Complaint as Exhibit A.)  As a RR, Butler solicited potential and existing AFS customers to purchase AFS products, including variable life insurance policies, variable annuity contracts, mutual funds, and other security products from 5010 Davis Lant Drive, Evansville, Indiana ("AFS Location").  (*Id.* ¶ 33.)

In consideration of Butler's access to existing and potential AFS customers and AFS Confidential Information, Butler agreed to protect AFS Confidential Information and to abide by certain reasonable restrictive covenants.  (*Id.* ¶ 35.)  Butler acknowledged that the following information is AFS's "confidential information" and property (referred to herein as "Confidential Information"):

> [AFS] business plans; information regarding the names, addresses, and ages of policyholders or customers; types of policies or contracts; amounts of insurance; premium amounts; renewal dates of policies or contracts; policyholder or customer listings and any policyholder or customer information subject to any privacy law; claim information; certain information and material identified by [AFS] as confidential or information considered a trade secret as provided herein or by law; and any information concerning any matters affecting or relating to our pursuits that is not otherwise lawfully available to the public.

(*Id.* ¶ 36; Agreement, p. 8, ¶ (d).)  Butler agreed that he would not, at any time or in any manner, directly or indirectly, use any Confidential Information for any purpose other than to carry out the provisions of the Agreement. (Compl. ¶ 37; Agreement, p. 8, ¶¶ (b)-(d).)   Moreover, Butler acknowledged that all Confidential Information that he had access to is AFS's exclusive property and was to be returned to AFS upon termination of the Agreement.  (Compl. ¶ 40; Agreement p. 4 ¶ j; p. 5, ¶ l; p. 8 ¶¶ a, b, e.)  Butler kept AFS Confidential Information, such as customer contact information and notes on customer preferences, in files that were maintained in file cabinets at the AFS Location.  (Compl. ¶ 38.)  Naturally, Butler used the AFS Confidential Information that was kept in the file cabinets to solicit and service AFS customers.  (*Id.* ¶ 39.)

Beyond the Confidential Information provisions, Butler agreed that, for a period of one year following termination of the Agreement, he would not solicit the purchase of registered products competitive with those sold by AFS or induce or advise any customer to lapse, surrender or cancel any coverage:

a. With respect to any person, company, or organization to whom [Butler] sold registered products on behalf of [AFS] and who is a customer of [AFS] at the time of termination of the Agreement; or

b. With respect to any person, company, or organization who is a customer of [AFS] at the time of termination of this Agreement and whose identity was discovered as a result of [Butler's] status as a registered representative of [AFS] or as a result of [Butler's] access to confidential information of [AFS]; or

c. From any office or business site located within one mile of any location from which [Butler] solicited or sold registered products during the year immediately preceding termination of the Agreement.

(Compl. ¶ 41; Agreement, pp. 9-10, ¶ g.)

In addition, Butler recognized that a breach of any of the provisions in his Agreement would "cause irreparable damage to [AFS's] business and that such damage is difficult or impossible to measure."  (Compl. ¶ 42; Agreement, p. 8, ¶ f.)  Accordingly, Butler agreed that if

6

he breached any of the obligations under the Agreement, then AFS would be "entitled to an order granting injunctive relief from any court of competent jurisdiction," in addition to other rights and remedies.  (Compl. at ¶ 43; Agreement, p. 8, ¶ f.)  Butler also agreed that AFS would be "entitled to an award of reasonable attorneys' fees in the event that [AFS] is successful in an application for injunctive relief or in an action based upon the breach" of any of the terms set forth in the Agreement.  (Compl. at ¶ 44; Agreement, p. 8, ¶ f.)

> ### D.      Butler Breaches the Agreement with AFS

Again, upon termination Butler agreed to: (a) immediately return all AFS Confidential Information to AFS; (b) not solicit AFS customers for one year; and (c) not solicit the sale of products that compete with AFS from any location that is within one mile of the AFS Location (5010 Davis Lant Drive in Evansville, Indiana) for one year after his relationship with AFS terminated.  (Compl. ¶ 45.)

Butler's Agreement and his relationship with AFS terminated on December 19, 2022.  (*Id.* ¶ 46.)  Consequently, Butler was required to return all AFS Confidential Information to AFS by December 19, 2022.  (*Id.* at ¶ 47.)  Butler was also prohibited from using, possessing, or accessing AFS Confidential Information after December 19, 2022.  (*Id.* at ¶ 48.)  Moreover, Butler was prohibited from soliciting AFS customers, and from soliciting the purchase of competing products from any location within one mile of his AFS Location (5010 Davis Lant Drive, Evansville, Indiana) until after December 19, 2023.  (*Id*. at ¶ 49.)

Unfortunately, Butler is breaching all of his post-termination obligations.  *First*, Butler (with the assistance of his son and two interns) intentionally obtained, retained and continues to use AFS Confidential Information after December 17, 2022.  (*Id.* ¶¶ 60-62; *see* Declaration of Lisa Dagley, attached to the Complaint as Exhibit C, ¶¶ 9-12.)  Before Butler's relationship with AFS terminated, Butler and Prudential instructed Butler's employee, Lisa Dagley, to create a "Holiday

List" containing confidential Allstate customer contact information. (*Id.* ¶¶ 58-59; Dagley Decl. ¶¶ 6-7.)  Dagley was to create the Holiday List by accessing Allstate's confidential and proprietary databases ("databases"), copying the Allstate Confidential Information contained in the databases (such as confidential contact information), and placing the copied Confidential Information onto a flash drive.  (*Id.*)  After Dagley refused to create the Holiday List, Butler had his nineteen year old son and two interns access, copy, and print AFS Confidential Information from filing cabinets that were stored at the AFS Location and from the Allstate databases so that Butler could take the information with him post-termination.  (*Id.* ¶ 60; Dagley Decl. ¶¶ 9-12.)  Upon information and belief, the AFS filing cabinets that Butler's son and the two interns accessed contained more than 1,500 customer files.  (*Id.* ¶ 62; Dagley Decl. ¶ 10.)  Unsurprisingly, after the Agreement and his relationship with AFS terminated, Butler did not return any of the AFS Confidential Information that he copied from the Allstate databases or the files that were maintained in cabinets at the AFS Location.  (*Id.* ¶ 63.)

*Second*, Butler is actively soliciting AFS customers and using the Confidential Information he stole from AFS in furtherance of his solicitation efforts. (*Id.* ¶ 64.)  In November and December of 2022, before terminating his relationship with AFS, Butler began soliciting AFS customers by informing them that he was leaving Allstate and joining Prudential and telling the customers that "nothing will change" if they were to leave Allstate and join Butler at Prudential.  (*Id.* ¶ 56; Dagley Decl. ¶ 13.)  After leaving AFS, Butler continued soliciting AFS customers through both written and verbal communications. Butler's solicitation efforts included a mass mailing campaign to AFS customers. (*Id.* ¶ 55; *see also* Butler mass-mailing letter, attached to the Complaint as Exhibit B.)  Given his pre-termination harvest of AFS customer information, it is a near certainty that Butler utilized (and is utilizing) the stolen AFS Confidential Information to engage in the mass

solicitation efforts.   Butler's illicit solicitations have already found success, as several AFS customers have terminated their registered AFS products and purchased competing registered products through Butler.   (*Id.* ¶ 65.)

*Third*, Butler is actively soliciting AFS customers and selling products that compete with AFS from his former AFS Location (5010 Davis Lant Drive, Evansville, Indiana).  (*Id.* ¶¶ 51-52.) Butler is doing so through Prudential and his firm Butler Financial Group ("BFG").  (*Id.*)  Thus, whether on behalf of Prudential or BFG, Butler continues to solicit the sale of products that compete with AFS products from his former AFS location in violation of the Agreement.  (*Id.*)

On January 6, 2023—after receiving evidence of Butler's breaches of the Agreement— AFS sent a cease and desist letter to Butler. (*Id.* ¶ 66; *see* AFS's January 6, 2023 letter, attached to the Complaint as Exhibit D.) Within the letter, AFS demanded that Butler (a) immediately stop soliciting AFS customers; (b) identify all AFS customers he has solicited or contacted since December 19, 2022, (c) identify and return all AFS Confidential Information in his possession, (d) cease and desist from soliciting competitive registered products to those offered by AFS from within one mile of the his former AFS location; and (e) affirm that he would comply with the duties and obligations that he still owes AFS by January 13, 2023.  (*Id.*)  Butler responded on January 11, 2023, claiming that he is "in compliance" with the duties and obligations he owes AFS, but his signature block simultaneously admitted that his current office location remains at the same address as his former AFS Location, in violation of his agreement with AFS.  (Compl. ¶¶ 67-72; *see* Butler's January 11, 2023 response, attached to the Complaint as Exhibit E.)  Butler's response also ignored AFS's requests to cease his use of the Confidential Information, to return the Confidential Information, and to compensate AFS for his violations of the Agreement.  (*Id.* ¶¶ 73-74.)

20720714 v2

III.    **ARGUMENT**

A.    **APPLICABLE LEGAL STANDARD**

"The standards that apply to preliminary injunction orders also apply to temporary restraining orders." *Steak n Shake Enterprises, Inc. v. iFood, Inc.*, No. 121CV02131TWPMPB, 2021 WL 3772012, at *3 (S.D. Ind. Aug. 25, 2021) (quoting *J.P. Morgan Sec. LLC v. Weiss*, No. 1:19-cv-4163-TWP-MPB, 2019 WL 6050176, at *4 (S.D. Ind. Nov. 15, 2019)). To obtain a temporary restraining order, the moving party must show that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) issuing a[] [TRO] is in the public interest." *Id.*  For the reasons below, AFS carries its burden on each factor and is entitled to a TRO that prevents Butler from continuing to use the stolen Confidential Information, soliciting AFS customers and selling products that compete with AFS from his former AFS Location.

B.    **AFS WILL SUCCEED ON ITS CLAIMS FOR BREACH OF CONTRACT AND FOR MISAPPROPRIATION OF ITS TRADE SECRETS.**

"A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute success on the merits. Instead, [it] must only show that [its] chances to succeed on its claims are 'better than negligible.'" *Badger Daylighting Corp. v. Palmer*, No. 1:19-cv-02106-SEB-MJD, 2019 U.S. Dist. LEXIS 160617, at *13-14 (S.D. Ind. Sep. 20, 2019) (quoting *Valencia v. City of Springfield, Illinois*, 883 F.3D 959, 966 (7th Cir. 2018)). Courts acknowledge that the likely-to-succeed factor "is a low threshold," and that the court "need not be certain about the outcome of the case" to find the first factor satisfied. *Id.* Allstate easily satisfies this factor, as Butler's actions plainly violate several provisions of the Agreement and constitute trade secret misappropriation.

**1.      *Butler Breached the Agreement.***

To demonstrate a likelihood of success on the merits for its breach of contract claim, AFS must show that the Agreement with Butler is valid, that Butler violated the Agreement, and resulting damages. *See Toyota Indus. Equip. Mfg. v. Land*, No. 1:14-cv-1049-JMS-TAB, 2014 U.S. Dist. LEXIS 99070, at ¶¶ 63-68 (S.D. Ind. July 21, 2014) (granting former employer plaintiff preliminary injunction, finding that the plaintiff was likely to succeed on breach of contract claim, stating "[t]he elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages."). Allstate demonstrates each element of its breach of contract claim.

*First*, the restrictive covenants in Butler's Agreement are valid and enforceable under Indiana law. The present Agreement mirrors the terms of a restrictive covenant that the court enforced in *J.P. Morgan Sec., LLC v. Weiss*, No. 1:19-cv-04163-TWP-MPB, 2019 U.S. Dist. LEXIS 198057, at *20-21 (S.D. Ind. Nov. 15, 2019). There, the Southern District of Indiana held that the brokerage-firm plaintiff had a "legitimate business interest in protecting its client relationships, lists, and information" and that the twelve-month non-solicitation covenant was "appropriately limited by the language that the prohibited solicitation applies to clients who were serviced by [defendant] or whose names became known to him through his employment." *Id.* at *21-23. AFS's Agreement with Butler is valid and enforceable for the same reasons. The Agreement is supported by consideration (Butler's ability to sell AFS registered products, receive commissions from the sales, and receive AFS Confidential Information), is limited in duration and scope (one year and to customers that Butler serviced or whose names he learned of through his status as a RR), and protects AFS's legitimate business interests (AFS customer relationships and Confidential Information).

Indiana courts routinely uphold similar restrictive covenants that are limited in time (one year) and scope (cannot solicit the customers he serviced or possessed confidential information

20720714 v2

about while he was a RR to purchase competing registered products). For example, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Goodson*, the Southern District of Indiana issued a preliminary injunction in favor of a plaintiff brokerage firm against a former broker, holding that a nearly identical restrictive covenant agreement was valid and enforceable. 820 F. Supp. 1128 (S.D. Ind. 1993). There, the agreement prevented the former broker from soliciting any client of the brokerage firm that lived within 100 miles of its office whom the employee learned of while working for the employer, and required the broker to return all original records and destroy any computerized records upon termination. *Id.* at 1130. As the Southern District of Indiana has recognized, "many courts before us have concluded in reviewing such cases, an employee who illicitly takes and retains his employer's proprietary information creates a risk of disclosure and misappropriation that warrants a finding that the movant has a reasonable likelihood of success on the merits of these legal claims [for breach of contract and under IUTSA]." *Palmer*, 2019 U.S. Dist. LEXIS 160617, at *25-26 (collecting cases).

*Second*, Butler breached the Agreement in several material ways. (*See* Compl. ¶¶ 45-74.) In violation of page nine, paragraph g(iii) of the Agreement, Butler is selling registered products that compete with AFS's registered products from his former AFS Location. (*Id*. ¶¶ 51-53.) In violation of page nine, paragraph g(i) and g(ii) of the Agreement, Butler is soliciting the very same AFS customers he serviced and/or knew about from his relationship with AFS in person and by mass mailings. (*Id.* ¶ 54-65.) And in violation of the confidentiality provisions on pages seven and eight of the Agreement, Butler retained AFS Confidential Information and is using it to further his solicitation efforts. (*Id.*) All of these activities constitute material breaches of the Agreement.

*Third*, Butler agreed that his breach of the foregoing provisions would cause AFS "irreparable damage to [AFS's] business and that such damage is difficult or impossible to

measure." (Agreement, page 8, paragraph f.) Moreover, customers have left AFS for Butler as a result of his illicit solicitations. (Compl. ¶ 65.) As the above-referenced cases demonstrate, Indiana courts recognize the likelihood of success on breach of contract claims under similar circumstances, particularly where, as here, clients have left as a result of the illicit solicitation. *See, e.g., Weiss*, 2019 U.S. Dist. LEXIS 198057, at *23-24 (finding sufficient evidence to support breach of contract claim, noting evidence of clients transferring accounts to former broker's new employer).

Accordingly, AFS has demonstrated a likelihood that it will succeed on its claim for breach of contract and that it needs injunctive relief to prevent further damage.

### 2.    *Butler Misappropriated AFS's Trade Secrets.*

AFS also is likely to succeed on its claims for misappropriation of trade secrets under the Indiana Uniform Trade Secrets Act, Ind. Code § 24-2-3, *et. seq.* ("IUTSA"), and the Defend Trade Secrets Act 18 U.S.C. § 1833, *et seq.* ("DTSA"). To establish a claim under either statute, AFS is first required to show that a legally protectable trade secret exists, and that Butler misappropriated the trade secrets. *Chroma Cars, LLC v. Harris*, No. 3:21-CV-825 DRL-MGG, 2022 U.S. Dist. LEXIS 94667, at *7-8 (N.D. Ind. May 25, 2022) (citing 18 U.S.C. §§ 1836(b)(1), 1839; Ind. Code §§ 24-2-3-2, 24-2-3-3; *Magnesita Refractories Co. v. Mishra*, 2018 U.S. Dist. LEXIS 206856, 38-42 (N.D. Ind. Dec. 7, 2018)).

A protectable trade secret possesses four characteristics: (1) information, (2) which derives independent economic value, (3) is not generally known or readily accessible by proper means by other persons who can obtain economic value from its use, and (4) is the subject of efforts reasonable under the circumstances to maintain its secrecy. *Palmer*, 2019 U.S. Dist. LEXIS 160617, at *21-22 (citing Ind. Code § 24-2-3-2). The AFS Confidential Information meets each characteristic and constitutes a legally protectable trade secret.

13

The Confidential Information includes AFS's most sensitive customer data, including customer lists and information regarding each customer's preferences, buying histories, and contact information.  (Compl. ¶ 27.)  This unique compilation of customer data allows AFS to be competitive in the financial services market, thereby deriving independent economic value.  (*Id.*)

AFS expends considerable efforts and monies to develop its Confidential Information. (*Id.* ¶¶ 28-31.)  For example, AFS protects its information by, among other things: limiting the disclosure and use of this information to only the RR who needs this information to sell AFS registered products; educating the RRs about the requirements and necessity of keeping this information confidential; restricting access to this information by limiting access to computer networks and requiring the use of passwords to access the information; and, as discussed above, requiring the RRs to execute written agreements that protect against the misuse and improper disclosure of AFS Confidential Information.  (*Id.*)

Indiana courts generally hold that such information qualifies as either confidential information or trade secrets where—like here—reasonable efforts are enforced to maintain their secrecy or keep them from becoming ascertainable to the general public. *See Palmer*, 2019 U.S. Dist. LEXIS 160617, at *23-24 (citing *Land*, 2014 U.S. Dist. LEXIS 99070,  at *3 (characterizing customer information, financial data documents, executive reports, organizational charts, pricing strategies, and product specifications as confidential information and trade secrets); *AL-KO Axis, Inc. v. Revelino*, No. 3:13-CV-1002 JD, 2013 WL 12309288, at *15 (N.D. Ind. Oct. 24, 2013) (recognizing cost structures and budgets, product development details and strategies, financial strategies, and marketing strategies as trade secrets); *U.S. Land Services, Inc. v. U.S. Surveyor, Inc.*, 826. N.E.2d at 60 (qualifying customers lists and databases as trade secrets when they contained substantial information about customers and prospective clients); *Star Sci., Inc. v.*

14

*Carter*, 204 F.R.D. 410, 414 (S.D. Ind. 2001) (concluding that customer lists and pricing information are protectable trade secrets)). Thus, AFS's Confidential Information constitutes a protectable trade secret, and AFS will have no difficulty establishing that Butler misappropriated these trade secrets.

Both statutes define misappropriation, in relevant part, as "disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret, or,

(ii) at the time of disclosure or use, knew or had reason to know that the trade secret was

(I) derived from or through a person who had used improper means to acquire the trade secret;

(II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or

(III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret."

18 U.S.C. § 1839(5); Ind. Code § 24-2-3-2 (same). Butler's actions meet the statutory definitions and constitute misappropriation.

Butler acquired the Confidential Information under circumstances giving rise to a duty to maintain secrecy. AFS exposed Butler to the Confidential Information after Butler agreed to the terms of the Agreement. (Compl. ¶ 35.)  Under the Agreement, Butler agreed to protect AFS's Confidential Information and further agreed to return all Confidential Information to AFS upon termination of the Agreement and his relationship with AFS.  (Agreement p. 4 ¶ j; p. 5 ¶ 1 (10); p. 7-8 ¶¶ a- e.) Butler breached the Agreement when he intentionally accessed, retained, and used the Confidential Information after his relationship with AFS terminated.

Again, before leaving AFS, Butler (with the assistance of his son and two interns) accessed, copied and printed over 1,500 customer files (the Confidential Information).  (Compl. ¶¶ 58-64.)

Butler then retained the Confidential Information after his relationship with AFS terminated and used the Confidential Information to solicit AFS customers on behalf of Prudential and/or BFG. (*Id.*)   Accordingly, Butler misappropriated AFS's trade secrets—he acquired the Confidential Information with a duty to maintain its secrecy and breached that duty by taking the Confidential Information with him to Prudential/BFG and using the Confidential Information to solicit AFS customers and compete with AFS.

As the Southern District of Indiana has recognized, Butler "is far from being the first employee of sneaking away from his job with his employer's documents in hand, many of which materials are of economic value to the employer and properly the subject of reasonable efforts to maintain their secrecy. In such circumstances, Indiana courts have consistently found a reasonable likelihood that non-disclosure provisions were breached and the IUTSA was violated." *Palmer,* 2019 U.S. Dist. LEXIS 160617, at *21 (collecting cases).

For these reasons, AFS is likely to prevail on its claims for misappropriation of trade secrets under both Indiana and federal law.

### C.     AFS WILL SUFFER IRREPARABLE INJURY WITHOUT INJUNCTIVE RELIEF.

"When an employee has been hired in violation of an employment agreement, Indiana courts will infer that the plaintiff has been irreparably harmed." *CDW LLC v. NETech Corp.*, 722 F. Supp. 2d 1052, 1064 (S.D. Ind. 2010) (citing *Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 178 (Ind.Ct.App. 2008)). "This is because the loss of confidential information, customer relationships, and employee morale are all injuries that are difficult to quantify in an action at law." *Id.* (citing *Barlow v. Sipes*, 744 N.E.2d 1, 7 (Ind.Ct.App. 2001)). The presumption of irreparable harm exists here, as Butler violated the Agreement with AFS by soliciting AFS customers using the Confidential Information that he was obligated to return.

16

As explained above, Butler was an AFS RR for nearly eighteen years. AFS customers know Butler and are familiar with Butler servicing their needs.  Butler now threatens the relationship between AFS and its customers by soliciting AFS's customers as a competitor in the financial services industry.  Butler has solicited AFS customers in person (even before he left AFS) and through mass mailings to AFS customers.  (Compl. ¶¶ 54-65.)  These actions not only indicate that Butler possesses AFS Confidential Information, but that Butler is also actively violating his Agreement and harming AFS.  *See Palmer*, 2019 U.S. Dist. LEXIS 160617, at *30 (holding that "pre-departure harvesting" of proprietary information compounds the threat of misuse and misappropriation that could likely result in irreparable harm).

Butler even acknowledged the irreparable harm his actions will/would cause AFS when he agreed that a breach of any of the obligations under the Agreement would "cause irreparable damage to [AFS's] business and that such damage will be difficult or impossible to measure." (Compl. ¶ 42; Agreement, p. 8, f); *see also Land*, No. 1:14-cv-1049-JMS-TAB, 2014 U.S. Dist. LEXIS 99070, at *17 (S.D. Ind. July 21, 2014) (citing to similar language in restrictive covenant agreement to hold that plaintiff would suffer irreparable harm).

AFS has demonstrated that it will suffer irreparable harm without the entry of a temporary restraining order. A temporary restraining order is necessary to prevent further damage to AFS's customer relationships and goodwill.

### D. THE GRANTING OF INJUNCTIVE RELIEF WILL NOT RESULT IN EVEN GREATER HARM TO BUTLER AND IS IN THE PUBLIC INTEREST.

In considering the appropriateness of injunctive relief, a court should balance the possible harm to plaintiff from denying injunctive relief against the possible harm to the defendant in granting it. *See, e.g., Amoco Production Co. v. Village of Gambell, Alaska*, 480 U.S. 531 (1987). Courts in the Seventh Circuit "weigh[] the balance of potential harms on a 'sliding scale' against

17

the movant's likelihood of success: the more likely he is to win, the less the balance of harms must weigh in his favor; the less likely he is to win, the more it must weigh in his favor." *Rolls-Royce N. Am. Techs. v. Dynetics, Inc.*, No. 1:19-cv-04302-TWP-TAB, 2020 U.S. Dist. LEXIS 13692, at *3 (S.D. Ind. Jan. 28, 2020) (quoting *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)). For all the reasons already stated, AFS is very likely to succeed on its breach of contract and trade secret claims, thereby moving the sliding scale to require less balance in AFS's favor. Sliding scale aside, the harm Butler would suffer if injunctive relief were ordered is far less than the harm AFS will suffer if it is not.

If a TRO is not granted, AFS will lose customer relationships, goodwill, and its Confidential Information. (Compl. ¶¶ 75-82); *J.P. Morgan Sec., LLC v. Weiss*, No. 1:19-cv-04163-TWP-MPB, 2019 U.S. Dist. LEXIS 198057, at *30 (S.D. Ind. Nov. 15, 2019) (recognizing the harm, where "[w]ithout an injunction, JPMorgan's confidential information and goodwill and its clients' confidence in its ability to maintain confidentiality are threatened."). In contrast, if a TRO is granted, Butler will not be prevented from engaging in any lawful activity. Butler will still be able to sell financial products and to lawfully compete against AFS and other financial firms.

Indeed, AFS only requests that Butler comply with the promises he made to AFS. Those promises include not soliciting AFS customers and/or selling competing products and services from his former AFS Location for one year. Thus, Butler is free to make a living in his chosen profession; and is even permitted to work for an AFS competitor and solicit non-AFS customers. Butler just cannot do so from his former AFS Location and/or by using AFS Confidential Information. Consequently, the harm AFS faces without a TRO substantially outweighs any personal hardship to Butler if a TRO is granted."

In sum, AFS is asking nothing more than for Butler to comply with the promises he made to AFS.  Butler has no legitimate right or interest in refusing to comply with the promises he made and contractual obligations he owes to AFS. Moreover, AFS is in urgent need of the Court's intervention to protect AFS's customer relationships, goodwill, and Confidential Information. Accordingly, the Court should grant AFS's Motion and enjoin Butler from continuing to breach the obligations he owes AFS.

## IV.    CONCLUSION

**WHEREFORE,** Plaintiff AFS Financial Services, LLC respectfully requests that this Court enter the proposed Order attached to the Motion as Exhibit 1, or enter a temporary restraining order:

    a.    Enjoining and restraining Butler and any and all parties in active concert with him from:

        (i)    Soliciting the purchase of registered products competitive with those AFS offers from within one mile of 5010 Davis Lant Drive, Suite 3, Evansville, Indiana;

        (ii)    Soliciting the purchase of registered products competitive to those AFS offers from any person Butler serviced or knew of through his relationship with AFS; and

        (iii)    Using any AFS Confidential Information for his own benefit and from disclosing AFS Confidential Information to anyone not authorized to receive the information; and

    b.    Enjoining and restraining Butler, and any and all parties in active concert with him, from using, possessing, or having access to AFS Confidential Information;

     c.       Ordering Butler to return all AFS Confidential Information and property in his possession, custody, or control;

     d.       Setting a preliminary injunction hearing within thirty (30) days of the filing of this Motion; and

     e.       For such other relief as the Court may deem just and proper.

Dated:  February 6, 2023

Respectfully submitted,

*/s/ Christopher T. Grohman*
CHRISTOPHER T. GROHMAN
J. SCOTT HUMPHREY (*Pro Hac Vice Forthcoming*)
KATIE M. BURNETT (*Pro Hac Vice Forthcoming*)
**Benesch, Friedlander, Coplan & Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone:  312.212.4949
Facsimile:  312.767.9192
Email: cgrohman@beneschlaw.com
     shumphrey@beneschlaw.com
     kburnett@beneschlaw.com


JOHN N. DAGON (*Pro Hac Vice Forthcoming*)
**Benesch, Friedlander, Coplan & Aronoff LLP**
200 Public Square, Suite 2300
Cleveland, OH 44114-2378
Telephone: 216.363.4500
Facsimile: 216.363.4588
Email: JDagon@beneschlaw.com

*Attorneys for Plaintiff Allstate Financial Services, LLC*

20

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 6th day of February, 2023, I electronically transmitted the attached

document to the Clerk's Office using the CM/ECF system for filing, and attach same for service

on the following:

J. Brett Butler
5010 Davis Lant Drive
Suite 3
Evansville, Indiana 47715

*/s/ Christopher T. Grohman*
CHRISTOPHER T. GROHMAN


*One of the Attorneys for Plaintiff Allstate*
*Financial Services, LLC*

21